**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------

**IN RE: MIAMI METALS I, INC.**

22-cv-606 (JGK)

**MEMORANDUM OPINION & ORDER**

------------------------------------------------

**JOHN G. KOELTL, District Judge:**

The appellants in this bankruptcy appeal, Mitchell Levine and Erie Management Partners, LLC ("Erie Management" and, with Levine, the "Levine Parties"), deposited precious metals with Republic Metals Corporation ("RMC") and its affiliates (together with RMC, the "Debtors").[1] After the Debtors filed for Chapter 11 bankruptcy, the Levine Parties asserted ownership interests in their deposits. The appellees, senior lenders of the Debtors (the "Senior Lenders"),[2] sought to include the Levine Parties' deposits as property of the bankruptcy estate. On cross-motions for summary judgment by the Levine Parties and the Senior Lenders, the bankruptcy court held that the disputed assets were the property of the bankruptcy estate. In re Miami Metals I, Inc., 634 B.R. 249, 252-53 (Bankr. S.D.N.Y. 2021) (the "Summary

---

[1] RMC is now known as Miami Metals II, Inc. See, e.g., App'x 1612 n.1.

[2] The appellees are Coöperatieve Rabobank U.A., New York Branch, Brown Brothers Harriman & Co., Bank Hapoalim B.M., Mitsubishi International Corporation, ICBC Standard Bank Plc, Techemet Metal Trading LLC, Merced Partners Limited Partnership, Athilon Capital Corp. LLC, and Hain Capital Investors Master Fund, Ltd. See In re Miami Metals I, Inc., 634 B.R. 249, 252 n.1 (Bankr. S.D.N.Y. 2021).

Judgment Decision"). The bankruptcy court entered judgment for the Senior Lenders, App'x 2949-50, and the Levine Parties filed this appeal, ECF No. 1. For the reasons below, the order and judgment of the bankruptcy court are **affirmed**.

**I.**

**A.**

The following facts are drawn from the appendix on appeal, ECF No. 21, and the Summary Judgment Decision and are undisputed unless otherwise noted.[3]

The Debtors were in the business of refining precious metals. Summary Judgment Decision, 634 B.R. at 253. Customers would send RMC and its affiliates unrefined material, mainly gold and silver. App'x 1615 ¶ 11; App'x 1689 ¶ 11. After RMC and a customer reached a final settlement on the amount of metal in a given shipment, the customer's "pool account" -- entries in RMC's books and records reflecting RMC's obligations to its customers, denominated in ounces of a specific type of metal -- would increase in the amount of the payable ounces for the

---

[3] Like the bankruptcy court, the Court principally considers Mitchell Levine and Erie Management Partners, LLC's Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 ("Levine's 7056 Statement"), App'x 1567-87; The Senior Lenders' Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 ("Senior Lenders' 7056 Statement"), App'x 1611-24; Mitchell Levine and Erie Management Partners, LLC's Response to Senior Lenders' Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 ("Levine 7056 Response"), App'x 1685-1708; and The Senior Lenders' Response to Mitchell Levine and Erie Management Partners, LLC's Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 ("Senior Lenders' 7056 Response"), App'x 1725-67.

2

metals in the shipment. App'x 1616 ¶ 14; App'x 1693 ¶ 14. After delivery, the Debtors would refine the customers' deposited metals and transfer the refined material to the Debtors' vault. App'x 1616 ¶ 15; App'x 1693 ¶ 15. During the refining process, individual customer lots were commingled with other customer lots. App'x 1616 ¶ 15; App'x 1693 ¶ 15. Customers who deposited metals with RMC could receive a cash payment, an electronic credit to their "Loco London" metals accounts,[4] or the option to receive like-kind refined metal at a later date. See App'x 1615 ¶¶ 13-14; App'x 1689 ¶¶ 13-14.

One longstanding RMC customer was Mitchell Levine. In 1995, Levine founded Asset Recovery Management ("ARM"), a secondary refiner of precious metals that aggregated precious metals from pawn shops, jewelry stores and manufacturers, dental labs, and others, and sent them to primary refiners like RMC. App'x 1568 ¶ 1; App'x 1618 ¶ 22. Over the years, Levine deposited hundreds of refining lots of gold, silver, and platinum with RMC. App'x 1569 ¶ 3; App'x 1727 ¶ 3. In 2008, Levine shuttered his refining business, but he maintained pool accounts with RMC in his own name and in the names of Erie Management, ARM's successor, and

---

[4] "The term Loco London simply refers to gold and silver bullion that is physically held in London vault to underpin the trading activity in [the London Bullion Market]." Loco London Precious Metals Market, LBMA, https://www.lbma.org.uk/market-standards/about-loco-london (last visited Feb. 22, 2023).

3

Plat/Co., another company Levine controlled. App'x 1573-74 ¶ 12; App'x 1619 ¶ 24. After 2008, Levine's pool account statement has remained static, consisting of some 2,323.908 Toz. of gold and 57,663.822 Toz. of silver. App'x 1620 ¶ 28; App'x 1701 ¶ 28.[5] Erie Management's pool account statement shows that all the gold and silver it claims in this ownership dispute was delivered to RMC and credited to Erie Management's pool account before January 1, 2015. App'x 1620 ¶ 29; App'x 1701 ¶ 29.

Initially, no written agreement governed the ownership of the Levine Parties' deposits with RMC, although Levine and Richard Rubin, RMC's first CEO, agreed that Levine's "metals would always be there when [Levine] needed them." App'x 1572 ¶ 8. Then, from 2011 through 2014, Levine signed three versions of RMC's Standard Terms and General Operating Conditions (the "Standard Terms"), twice on behalf of Erie Management and once on his own behalf. App'x 1618 ¶ 21; App'x 1697 ¶ 21. The Standard Terms represented "the governing document with respect to any and all business dealings" between RMC and Levine and his companies, "over[o]de any and all provisions, terms, and stipulations" in "any other Customer

---

[5] A "troy ounce," or "Toz.," is "a system of weight used for precious metals and gems, based on a pound of 12 ounces as opposed to the traditional 16. A troy ounce is 31.1034768 grams or 0.0311034768 kilograms." What is a troy ounce?, ROYAL MINT, https://www.royalmint.com/faqs/bullion/what-is-a-troy-ounce/ (last visited Feb. 22, 2023).

4

Documents," and provided that any other "contract or agreement entered into" between the signatories "will operate as if the terms represented in th[e] Standard Terms were made expressly a part thereof." App'x 2485 (2011 Standard Terms); App'x 2500 (2013 Standard Terms); App'x 2521 (2014 Standard Terms).[6]

The Standard Terms also provided that because "[p]recious [m]etals are fungible," "[r]eturnable [m]etal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal." App'x 2486 (2011 Standard Terms); App'x 2504 (2013 Standard Terms); App'x 2524 (2014 Standard Terms). Rather, "it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or platinum group metals." App'x 2486, 2504, 2524. If the Levine Parties ever sought to withdraw their deposits, the Standard Terms gave RMC "the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer." App'x 2486, 2504, 2524. Many RMC customers signed the Standard Terms. See In re Miami Metals I, Inc., 603 B.R. 727, 730 (Bankr. S.D.N.Y. 2019) (the "Bucket One Decision").

In January 2015, Levine approached RMC to discuss ways to generate income from the Levine Parties' deposits. App'x 1574

---

[6] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

5

¶ 15. In February 2015, RMC began paying the Levine Parties monthly fees, called "lease fees" on invoices, at a fixed rate of 1.35% per year. See App'x 1621 ¶ 32; App'x 1702 ¶ 32. The Levine Parties transferred no new metal to RMC when they entered into this arrangement with RMC. The invoices also stated that the "lease" transactions were "[s]ubject to RMC Standard Terms." E.g., App'x 76; see generally App'x 76-279. Three years later, on January 22, 2018, Levine and David Comite, RMC's Chief Financial Officer, discussed entering into a similar arrangement for platinum then held for Levine at a London refinery that was closing its operations. See App'x 1620 ¶ 30; App'x 1621-22 ¶¶ 35-37; App'x 1704 ¶¶ 35-37. On May 24, 2018, Comite and Levine agreed that RMC would "lease" 2,000 Toz. of platinum from Levine and pay fees at 1% per year. App'x 1622 ¶ 41; App'x 1705 ¶ 41. RMC paid Levine monthly fees on the platinum from June through October 2018. App'x 1623 ¶ 45; App'x 1706-07 ¶ 45. Like the gold and silver interest invoices, the invoices on the platinum arrangement provided that the transactions were "[s]ubject to RMC Standard Terms." E.g., App'x 230; see generally App'x 228-82.

**B.**

In November 2018, RMC filed for Chapter 11 bankruptcy in the Bankruptcy Court of the Southern District of New York. After Levine, Erie Management, Plat/Co., and around forty other

customers asserted ownership interests in their deposits, the bankruptcy court created "buckets" to resolve their disputes based on the type of contract governing each customer's relationship with RMC. See Summary Judgment Decision, 634 B.R. at 253. The claims of "Bucket One" customers, including Plat/Co., were indisputably governed by the Standard Terms. See Bucket One Decision, 603 B.R. at 730-31. The only issue with respect to these customers was whether the Standard Terms provided for a sale of precious metals -- giving the Debtors ownership of the deposits and the Senior Lenders a security interest in the deposits -- or a bailment in which ownership remained with the customers.[7] See Summary Judgment Decision, 634 B.R. at 253-54. "Bucket Eight" customers, including Levine and Erie Management, asserted ownership interests from purported leases. Id. at 253. Levine and Erie Management maintained that they entered into lease agreements beginning in 2015, as reflected in RMC's "monthly statements to the [Levine Parties] from February 2015 through October 2018." App'x 70.

On August 9, 2019, the bankruptcy court held in favor of the Senior Lenders on the Bucket One claims. See Bucket One

---

[7] A bailment "is generally a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner." Bucket One Decision, 603 B.R. at 734-35. "Bailment bifurcates ownership from possession; general ownership remains with the bailor while the bailee has lawful possession." Id. at 735.

Decision, 603 B.R. at 742-43. The bankruptcy court began by drawing the "recognized distinction between bailment and sale." Id. at 735 (quoting Sturm v. Boker, 150 U.S. 312, 329 (1893)). "[W]hen the identical article is to be returned in the same or in some altered form," the bankruptcy court explained, "the contract is one for bailment, and the title to the property is not changed." Id. (quoting Sturm, 150 U.S. at 329). Meanwhile, the "transaction is a sale" when "there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value." Id. (quoting Sturm, 150 U.S. at 329). The bankruptcy court concluded that because the Standard Terms did not entitle a customer to receive specific precious metals derived from the raw materials delivered to RMC, but instead only "like kind" metals, the Bucket One customers sold, rather than bailed, their deposits to RMC. Id. at 736, 742.

On May 22, 2020, the Senior Lenders and the Levine Parties cross-moved for summary judgment on the Levine Parties' ownership claims to their deposits. The Senior Lenders argued that the Bucket One Decision was dispositive of the Levine Parties' claims because of the Levine Parties' agreement to the Standard Terms. The bankruptcy court agreed, noting that under each of the three versions of the Standard Terms that Levine signed, the Standard Terms governed the entire relationship of the parties and overrode any contrary arrangements. See Summary

8

Judgment Decision, 634 B.R. at 264. Therefore, the bankruptcy court concluded, the "Bucket One Decision on the meaning of the Standard Terms applie[d]." Id. Thus, the Levine Parties had sold, rather than bailed, their deposits to RMC and had no continuing ownership interests in the deposits. Id. at 265.

The bankruptcy court acknowledged that the Levine Parties had presented evidence of a leasing relationship beginning in 2015 but concluded that this "sort of parol[] evidence is only permitted when a written contract is determined to be ambiguous," which the bankruptcy court explained was not true of the Standard Terms. Id. at 264-65. As for the Levine Parties' argument that they had a unique relationship with the Debtors before Levine signed the Standard Terms, the bankruptcy court found this argument foreclosed by the "broad scope of the Standard Terms." Id. at 265. While Levine "may sincerely have had a different understanding of the parties' relationship," the bankruptcy court reasoned, "he is charged with knowledge of the terms of the contract that he signed on three different occasions." Id.

The Levine Parties now appeal from the bankruptcy court's decision and judgment.

## II.

The standard for granting summary judgment is well established. A "court shall grant summary judgment if the movant

9

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then the issue is in dispute and summary judgment is not warranted. Id. The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact" such that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

On appeal, the Court reviews a bankruptcy court's factual findings for clear error and its legal conclusions de novo. In re Bonnanzio, 91 F.3d 296, 300 (2d Cir. 1996). The Court may affirm on any ground that finds support in the record and need not limit its review to the basis raised or relied upon in the decision below. In re Aurora Com. Corp., No. 20-cv-4719, 2021 WL 1634693, at *2 (S.D.N.Y. Apr. 26, 2021); In re Coronet Cap. Co., No. 94-cv-1187, 1995 WL 429494, at *3 (S.D.N.Y. July 20, 1995).

## III.

The Levine Parties raise two arguments on appeal to support their contention that they own their deposits with RMC. First, they argue that the bankruptcy court erred in applying the parol

10

evidence rule to bar evidence that the Levine Parties began leasing to RMC their gold and silver deposits in 2015 and their platinum deposits in 2018. Second, the Levine Parties argue that the bankruptcy court erred in applying the Standard Terms to deposits delivered before the execution of the Standard Terms. The bankruptcy court's decision withstands both challenges.

The plain language of the Standard Terms disposes of the Levine Parties' second argument. Each of the three versions of the Standard Terms that Levine signed between 2011 and 2014 contained an identical introductory clause stating that the Standard Terms govern "any and all business dealings between RMC and" the Levine Parties and "shall override any and all provisions, terms, and stipulations in Customer purchase orders, sales orders and/or any other Customer documents." See <u>Summary Judgment Decision</u>, 634 B.R. at 264. The bankruptcy court therefore concluded properly that the Standard Terms applied to the Levine Parties' pre-2015 deposits. <u>Id.</u> Because the Standard Terms applied to these deposits, the bankruptcy court also correctly determined, for the reasons explained in the Bucket One Decision, the merits of which the Levine Parties do not challenge, that deposits subject to the Standard Terms were

sold, rather than bailed, with ownership passing from the Levine Parties to RMC. See Bucket One Decision, 603 B.R. at 735.[8]

The Levine Parties argue that the Standard Terms apply only prospectively, not retroactively, such that no metals "already in RMC's possession prior to execution would retroactively be converted into a sale to RMC." Appellants' Br., ECF No. 16, at 36. The broad provisions of the Standard Terms foreclose this argument. The Standard Terms unambiguously superseded all preexisting agreements between the parties, governed all business dealings between the parties, and provided that continuing to "do[] business with RMC after having received the Standard Terms" deems a customer to "have agreed to accept the [Standard] Terms." App'x 2486 (2011 Standard Terms); App'x 2500 (2013 Standard Terms); App'x 2521 (2014 Standard Terms). By continuing to maintain a pool account with RMC, the Levine Parties agreed to be bound by RMC's Standard Terms. There is

---

[8] The Senior Lenders argue that the Levine Parties are collaterally estopped from relitigating the Bucket One Decision, because Levine "actively participated in the briefing of the Bucket [One] summary judgment motion and was given a full and fair opportunity to challenge the Senior Lenders' motion." Appellees' Br., ECF No. 17, at 33. The Levine Parties respond that their lease claims "were expressly excluded from, and therefore not covered or precluded by, the Bucket One Decision." Appellants' Reply Br., ECF No. 20, at 6. It is unnecessary to resolve this dispute. Regardless of whether the Levine Parties are collaterally estopped from relitigating the Bucket One Decision, they have not challenged its central holding that the Standard Terms established a sale, not a bailment. That conclusion is well supported in the record. The metals deposited by the Levine Parties became commingled with the metals deposited by other parties, and the Levine Parties had no right to retrieve the actual metals they deposited with RMC.

therefore no merit to the Levine Parties' contention that the Standard Terms did not apply to gold and silver delivered to RMC before the execution of the Standard Terms.

Equally unavailing is the Levine Parties' first argument, that they established a "leasing" relationship with RMC beginning in February 2015. The bankruptcy court rejected this argument on the ground that it would require the court to consider extrinsic evidence about the meaning of the Standard Terms that was proffered by the Levine Parties but that was barred by the parol evidence rule. See Summary Judgment Decision, 634 B.R. at 264-65. The Levine Parties respond that the parol evidence rule generally does not bar evidence of subsequent agreements that modify the parties' written contract. See, e.g., Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC, No. 07-cv-7998, 2008 WL 3919186, at *2 (S.D.N.Y. Aug. 25, 2008); Regions Bank, Etc. v. Kaplan, No. 12-cv-1837, 2016 WL 1592752, at *13 (M.D. Fla. Apr. 18, 2016).[9]

---

[9] The Standard Terms are silent on choice of law. Before the bankruptcy court, the parties agreed that "Florida law governs this dispute but that both Florida and New York law would create the same outcome." Summary Judgment Decision, 634 B.R. at 259. The bankruptcy court therefore cited to both Florida and New York statutes and case law. Id. at 260; see also IBM v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis[.]"). The parties do not point to any difference between the laws of Florida and New York with respect to the parol evidence rule.

It is unnecessary to reach the argument with respect to the alleged incorrect application of the parol evidence rule, because even if the bankruptcy court had considered the Levine Parties' proffered evidence, that evidence could not demonstrate the Levine Parties' ownership of the disputed assets. By the time RMC began paying the Levine Parties what the parties called "lease fees" on gold and silver deposits in February 2015, RMC owned these deposits pursuant to the Standard Terms. The Levine Parties did not deliver any physical metal at this time, nor was any existing physical metal segregated, set aside, or earmarked for the Levine Parties. The May 2018 platinum "lease" transaction with RMC was also made subject to the Standard Terms. The alleged February 2015 and May 2018 agreements required RMC to pay monthly fees on the Levine Parties' pool account balances, but RMC's payment of these fees did not vest title to any precious metals in the Levine Parties or otherwise alter the Standard Terms.

Moreover, simply calling the continued holding of the Levine Parties' pool credits a "lease" did not make it so. "[T]he label placed on the transaction is not controlling." In re Lykes Bros. S.S. Co., Inc., 196 B.R. 574, 585 (Bankr. M.D. Fla. 1996); see also, e.g., In re Fleming Cos., Inc., 308 B.R. 693, 696 (Bankr. D. Del. 2004) ("In determining whether a lease is a true lease, the form or title chosen by the parties is not

14

determinative."). Rather, courts consider "the economic substance of the transaction." Lykes, 196 B.R. at 581; see also Fleming, 308 B.R. at 696 (focusing on the "economic realities of the transaction"). In this case, the economic substance of the lease-fee arrangements demonstrates not that there was a specific good owned by the Levine Parties and "stored" by RMC, but instead that the Levine Parties were paid fees in exchange for not withdrawing their pool account balances. The invoices that applied to the Levine Parties' "lease fees" were subject to the Standard Terms, which established a sale of precious metals to RMC. In other words, there could be no leases because the Levine Parties, "the so-called lessors[,] entered the transaction[s] without any property to lease." Lykes, 196 B.R. at 583.

Because the Levine Parties have no continuing ownership interest in the deposits at issue, the bankruptcy court correctly granted summary judgment for the Senior Lenders and against the Levine Parties.[10]

---

[10] The Levine Parties' reliance on Judge Mukasey's opinion in In re Pan Am Corp., 130 B.R. 409 (S.D.N.Y. 1991), is unavailing. See Appellants' Reply Br. at 21. That case concerned the "extraordinary protection" given to aircraft equipment leases by the bankruptcy code. Pan Am, 130 B.R. at 412. Pan Am bears no factual similarity to this case. And even crediting Judge Mukasey's observation that "an agreement called a 'lease'" may be a bona-fide lease even "if it permits the lessee to return different equipment" on expiration of the lease, Pan Am, 130 B.R. at 413, the Levine Parties cannot show that they held leases from 2015 to 2018, because the Standard Terms provided unambiguously that they sold their deposits to RMC.

15

CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the order and judgment of the bankruptcy court are **affirmed**. The Clerk is directed to close all pending motions and to close this case.[11]

**SO ORDERED.**

Dated: New York, New York
February 27, 2023

_____
John G. Koeltl
United States District Judge

---

[11] Because the facts and legal arguments were adequately presented in the briefs and record, and the decisional process would not have been significantly aided by oral argument, the appellants' motion for oral argument, ECF No. 22, is **denied.** See Fed. R. Bankr. P. 8019(b)(3).

Additionally, after briefing concluded, the Senior Lenders submitted a copy of a transcript of the bankruptcy court's bench decision granting in part and denying in part the Senior Lenders' motion for reargument of a portion of the Summary Judgment Decision not relevant to this appeal. See ECF No. 24. The Levine Parties moved to strike this document as an impermissible attempt to supplement the record in this appeal. ECF No. 25. The Court did not consider the documents enclosed in ECF No. 24 in deciding this appeal. The motion to strike therefore is **denied as moot.**